ATTORNEYS FOR APPELLANT

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Mark K. Leeman
Leeman Law Office
Logansport, Indiana



FILED

Aug 19 2020, 9:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# COURT OF APPEALS OF INDIANA

State of Indiana,

*Appellant-Plaintiff,*

v.

Axel Domingo Diego,

*Appellee-Defendant.*

August 19, 2020

Court of Appeals Case No.
20A-CR-227

Interlocutory Appeal from the
Cass Circuit Court

The Honorable Stephen Roger
Kitts, II, Judge

The Honorable Leo T. Burns,
Senior Judge

Trial Court Cause No.
09C01-1806-FA-1

**Bailey, Judge.**

# Case Summary

The State of Indiana ("State") brings this interlocutory appeal of the trial court order granting Axel Domingo Diego's ("Domingo Diego") motion to suppress the recordings of his interrogation by police. The only restated issue on appeal is whether *Miranda* warnings were unnecessary because Domingo Diego was not in custody during his interrogation.

We affirm.

# Facts and Procedural History

On June 26, 2018, following an interrogation of Domingo Diego, the State charged him with child molesting, as a Class A felony.[1] On March 12, 2019, the State filed an amended information charging Domingo Diego with two counts of child molesting, as Class A felonies, and one count of child molesting as a Class C felony.[2] On May 24, Domingo Diego filed a motion to suppress his statement to police. The trial court held a hearing on the motion to suppress on October 31, 2019. Evidence of the following facts was submitted at that hearing.[3]

---

[1] Ind. Code § 35-42-4-3(a)(1).

[2] I.C. § 35-42-4-3(b).

[3] In accordance with the applicable standard of review, discussed in more detail below, we consider the evidence—including conflicting evidence—most favorable to the trial court's suppression ruling. *E.g.*, *State v. Ruiz*, 123 N.E.3d 675, 679 (Ind. 2019).

[4] In June 2018, officers with the Logansport Police Department called Detective Sergeant Troy Munson ("Det. Munson") with the Seymour Police Department ("SPD") and asked for his assistance in locating and interviewing Domingo Diego, who they believed was living in Seymour and who they suspected of molesting a child. The Logansport Police Department shared with Det. Munson a police report and forensic interview in which a child, "C.," accused Domingo Diego of molesting her. After Det. Munson watched the forensic interview, he located Domingo Diego's address in the SPD computer system.

[5] On June 19, 2018, an officer from SPD[4] arrived at Domingo Diego's home, and Domingo Diego's long-time girlfriend, Andrea Martin ("Martin"), opened the door. The officer was in "uniform," Tr. V. II at 59, and he was wearing a police badge and a gun. The officer asked to speak with Domingo Diego. When Domingo Diego arrived at the door, the officer stated that he would like to speak with Domingo Diego "about an incident that had occurred in Logansport." *Id*. at 18. The officer stated that Domingo Diego "needed" to go to the police station so that Det. Munson could speak with him. *Id*. at 47. The officer gave Domingo Diego Det. Munson's business card and a date and time to go to Det. Munson's office at the SPD station. Martin, who speaks Spanish, English, and Chuj, translated the officer's statements for Domingo Diego, who speaks Chuj, Spanish, and only a little English.

---

[4] Det. Munson testified that he was the SPD officer who went to Domingo Diego's house that day, but Domingo Diego and Andrea Martin testified that it was another, unknown police officer.

[6]     On June 21, Domingo Diego and Martin arrived at the SPD police station and asked for Det. Munson. SPD personnel opened a secured door for Martin and Domingo Diego, and it was shut behind them. No one informed Martin or Domingo Diego that they could leave through the secure door without assistance. Martin and Domingo Diego were directed to an elevator, which they took to the second floor. On the second floor, Det. Munson came out of his office into the common area to greet Martin and Domingo Diego. Det. Munson wore plain clothes but carried a gun, and he was accompanied by an SPD dispatcher, in plain clothes, who also worked as an English/Spanish translator. Det. Munson asked Martin to wait in another room while he interviewed Domingo Diego, and he informed Martin and Domingo Diego that the SPD English/Spanish translator ("the translator") would assist with the interview.

[7]     Det. Munson, the translator, and Domingo Diego entered Det. Munson's office. Det. Munson closed the door to the office and the blinds to the windows between his office and the common area. Det. Munson sat behind his desk, Domingo Diego sat in a seat in front of the desk, and the translator sat in the seat between Domingo Diego and the door to the office. Det. Munson informed Domingo Diego that he was "not under arrest," and that he was "free to leave anytime [he] want[ed] to go." State's Ex. 4 at 3. Det. Munson asked Domingo Diego if he understood and Domingo Diego nodded his head.

State's Ex. 3, Part I,[5] at 00:46.  However, Det. Munson did not tell Domingo Diego that he did not have to answer Det. Munson's questions.  Det. Munson proceeded to question Domingo Diego, through the translator, for approximately forty minutes.  Det. Munson did not at any time provide Domingo Diego with *Miranda* warnings.

[8]  At various points throughout the interrogation, Det. Munson stated that he believed Domingo Diego had sexual contact with the child, "C."[6]  He also indicated several times that he believed Domingo Diego's denials were lies.[7]  Det. Munson also made statements stating it was understandable if Domingo Diego had sexual contact with C.[8]  Det. Munson stated that C. was "saying with … with pretty great detail about what happened between the two of you."

---

[5]  The CD containing the audio-visual recording of the June 21, 2019, interrogation was divided into two separate parts.

[6]  For example, Det. Munson stated "something happened between you and [C.].  It may not have been to the extreme that Miguel had said [i.e., that Domingo Diego raped C.], but tell me what actually happened between you and [C.]."  Ex. 4 at 14.

[7]  Det. Munson stated that he had listened to a recording of a conversation in which C.'s father had accused Domingo Diego of raping C. and then stated, "[L]ying to me only makes things worse," Ex. 4 at 14.  Det. Munson also stated, "Hey look, Axel, you don't, you don't need to lie to me.  You don't need to be afraid of me for any reason or [sic] whatsoever," *id.* at 22.

[8]  For example, Det. Munson stated to Domingo Diego,

> Okay, so we understand that sometimes guys, they get horny. … So, sometimes what happens is … is guys just make a mistake and when they make that mistake is, what they do is, there happens to be whoever's there, they end up touching them or whatever they need to do to satisfy themselves, but it's not so much that they want to be with a child, it's just that they want to release this sexual tension. …So, I'm wondering if, if maybe that's not what happened here, 'cause I think you're a pretty good guy.  But I'm, I'm thinking to myself, you know, did you do something …

Ex. 4 at 15-16.

Ex. 4 at 17.[9] He informed Domingo Diego, "the evidence in this case … clearly shows that you had some type of contact with [C.'s], um … her vaginal area, her butt, and her breast area." *Id.* at 19. Det. Munson asked Domingo Diego, "So you just … basically touched her vagina and touch[ed] her breast area. Is that correct?" *Id.* Det. Munson continued, "[C.] told me[10] about a situation where um, your, your penis had been touching, your bare penis had been touching her butt. Um, did you actually stick your penis inside of her butt or was it just, did you just rub it on the outside of her butt?" *Id.* Det. Munson stated to Domingo Diego, "Uh, and then how many times do you think your hand … now, you know as well as I do, it wasn't when you were just playing around," and then asked, "How, how many times do you think your hands just kind of touched her breasts or touched her vagina?" *Id.* at 24.

[9] After asking Domingo Diego if he knew that what happened with C. was "wrong" and whether Domingo Diego felt "sorry about doing it," Det. Munson asked Domingo Diego if he "would like to write [C.] an apology" that Det. Munson could give to her. *Id.* at 30. When Domingo Diego hesitated, Det. Munson stated, "Well, what I'm just saying, it may help, it may let this little girl know that, 'Hey, I was wrong and I'm sorry' and then she can put [it] behind her." *Id.* at 31. Det. Munson stated to the translator, "Hey, he doesn't

---

[9] We note that the written transcript with translation of the June 21 interrogation, State's Exhibit 4, sometimes mislabels who is speaking, as compared to the audio-visual recording in State's Exhibit 3.

[10] Det. Munson did not talk to C. directly; rather, he reviewed the recording of her interview with police.

have to, I'm just saying I think it'd be a good idea." *Id.* At the conclusion of the interrogation, Det. Munson told Domingo Diego, "You're free to go" but "[d]on't have any more contact with that family." *Id.* at 33.

[10] Following the hearing on Domingo Diego's motion to suppress his statement to police, the trial court issued its December 20, 2019, order granting the motion. After noting that the parties did not request findings and conclusions pursuant to Indiana Trial Rule 52, the court noted, "The facts in this case regarding defendant's statement to police are similar to the facts considered by the [Indiana] Supreme Court in *State of Indiana v. Ernesto Ruiz*.[11]" Appellant's App. V. 2 at 40. The trial court concluded that the *Ruiz* case "controls this case" and Domingo Diego's statement cannot be used against him. *Id.* The State now brings this interlocutory appeal.[12]

# Discussion and Decision

## Standard of Review

[11] The State is appealing a negative judgment, i.e., the order suppressing Domingo Diego's statement. When the State appeals from a negative judgment, it

---

[11] 123 N.E.3d 675 (Ind. 2019).

[12] The State may appeal the grant of a motion to suppress evidence in a criminal case "if the ultimate effect of the order is to preclude further prosecution of one (1) or more counts of an information or indictment." I.C. § 35-38-4-2(5). Although the State has not alleged that it cannot further prosecute Domingo Diego without his statement to police, it apparently made that determination, and "it is not within our purview to second-guess" it. *State v. Wroe*, 16 N.E.3d 462, 465 (Ind. Ct. App. 2014), *trans. denied*.

must show that the trial court's grant of the motion was contrary to law. We will reverse a negative judgment only when the evidence is without conflict and all reasonable inferences lead to a conclusion opposite that of the trial court. We will not reweigh the evidence nor judge witnesses' credibility and will consider only the evidence most favorable to the trial court's ruling.

*State v. Janes*, 102 N.E.3d 314, 317 (Ind. Ct. App. 2018) (citations omitted). We will not reverse the trial court's ruling on suppression if it is supported by substantial evidence of probative value. *Id*.

## Custodial Interrogation

[12] Suspects under custodial interrogation must be given *Miranda* warnings; that is, pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), individuals in custodial interrogation must be told that they have "a right to remain silent, that any statement [they do] make may be used as evidence against [them], and that [they have] a right to the presence of an attorney." *See also State v. Ruiz*, 123 N.E.3d 675, 677 (Ind. 2019). However, when an individual is not in police custody, he or she is not entitled to *Miranda* warnings before police questioning. *Id*.

[13] In the instant case, it is undisputed that the SPD did not give Domingo Diego *Miranda* warnings before interrogating him on June 21, 2019; therefore, whether Domingo Diego's statement are admissible at his criminal trial depends upon whether Domingo Diego was in "custody" during the police interrogation. The custody inquiry is a mixed question of fact and law: the circumstances surrounding the interrogation are matters of fact that we review with deference,

and whether those facts amount to *Miranda*-type custody is a question of law that we review de novo. *Ruiz*, 123 N.E.3d at 679.

[14] An individual is in police "custody" when two factors are met: (1) the person's freedom of movement is curtailed to the degree associated with a normal arrest, and (2) the person undergoes the same inherently coercive pressures as the type of station-house-questioning at issue in the *Miranda* case. *Id*. at 680. Ultimately, we must determine whether "[t]he totality of objective circumstances surrounding the interrogation would make a reasonable person feel not free to end the questioning and leave." *Id*. In making that determination, the court may consider such circumstances as "the location, duration, and character of the questioning; statements made during the questioning; the number of law-enforcement officers present;… and how the interview begins and ends." *Id*. The court may also consider such factors as:

> whether and to what extent the person has been made aware that he is free to refrain from answering questions; whether there has been prolonged, coercive, and accusatory questioning, or whether police have employed subterfuge in order to induce self-incrimination; the degree of police control over the environment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed; and whether the suspect could reasonably believe that he has the right to interrupt prolonged questioning by leaving the scene.

*State v. O.E.W.*, 133 N.E.3d 144, 154 (Ind. Ct. App. 2019), *trans. denied*.

[15] Applying the above factors to this case, it is clear that the trial court's order suppressing Domingo Diego's statement to police is supported by substantial evidence of probative value. Domingo Diego's freedom of movement was curtailed to the degree associated with an arrest, and he was subjected to inherently coercive pressures such as those at issue in *Miranda*. The police determined and controlled the environment in which the interrogation took place, i.e., Domingo Diego was removed from his girlfriend and placed in a closed room in a police station with an SPD employee sitting between Domingo Diego and the closed door. Although Domingo Diego was told he was not under arrest and was free to leave, he was also told that he "needed" to be there to answer Det. Munson's questions. Tr. V. II at 47. He was never told that he was free to refuse to answer Det. Munson's questions, nor was he told that he could leave through the secured police station door without police assistance.

[16] Furthermore, Domingo Diego was subjected to prolonged questioning that lasted approximately forty minutes; the questioning was "sustained and drawn out" as compared to brief "roadside traffic-stop questioning." *Ruiz*, 123 N.E.3d at 681. And Det. Munson's questioning was persistent and accusatory: he repeatedly stated as fact that Domingo Diego had engaged in sexual contact with C., he repeatedly accused Domingo Diego of lying when Domingo Diego denied such activity, and he repeatedly asked questions that "focused on encouraging [Domingo Diego] to admit to [Det. Munson's] description of the wrong-doing." *Id*. at 682. Det. Munson even went so far as to attempt to get

Domingo Diego to write out a confession, in the guise of a letter apologizing to C. for having sexual contact with her.

[17] The trial court did not err in finding that the facts in this case, like those in *Ruiz*, supported an order suppressing the defendant's statement. The State asks that we credit Det. Munson's conflicting testimony; however, that is simply a request that we reweigh evidence and witness credibility, which we may not do. *Janes*, 102 N.E.3d at 317; *see also Ruiz*, 123 N.E.3d at 679.

# Conclusion

[18] The trial court did not err when it granted Domingo Diego's motion to suppress his statement to police because the statement was obtained during custodial interrogation without *Miranda* warnings.

[19] Affirmed.

Vaidik, J., and Baker, S.J., concur.